```
 1                    UNITED STATES DISTRICT COURT
                          DISTRICT OF NEVADA
 2       BEFORE THE HONORABLE PHILIP M. PRO, SENIOR DISTRICT JUDGE
                            ---o0o---
 3

 4    UNITED STATES OF AMERICA,      : No. 2:11-cr-0247-PMP
                                     :
 5               Plaintiff,          :
                                     : October 15, 2013
 6          -vs-                     :
                                     : United States District Court
 7    WILLIAM REED,                  : 333 S. Las Vegas Blvd.
                                     : Las Vegas, Nevada
 8               Defendant.          :
                                     :
 9    _____:

10

11
                         TRANSCRIPT OF SENTENCING
12

13    A P P E A R A N C E S:

14    FOR THE GOVERNMENT:        Gregory Damm
                                 Assistant United States Attorney
15                               Las Vegas, Nevada

16
      FOR THE DEFENDANT:         Paola Armeni
17                               Assistant Federal Public Defender
                                 Las Vegas, Nevada
18

19    PROBATION OFFICER:         Wendy Beckner

20
      PMP/FTR:  101513@3:30pm
21

22    Proceedings recorded by digital recording produced by
      computer-aided transcript.  Transcriber not present during
23    proceedings

24
      Transcribed by:           KATHRYN M. FRENCH, RPR, CCR
25                               NEVADA LICENSE NO. 392
                                 CALIFORNIA LICENSE NO. 8536
```

1          Reno, Nevada, Tuesday, October 15, 2013, 3:30 p.m.

2                          ---OoO---

3

4              THE COURT:  All right.  Have a seat, counsel.

5          All right.  We are convened for sentencing

6     in  United States of America versus William Reed,

7     Criminal-S-11-247.

8              Mr. Reed is present with counsel, Paola Armeni.

9              We have Greg Damm on behalf of plaintiff United

10    States.

11             Wendy Beckner on behalf of the Department of

12    Probation.

13             Mr. Reed, on the 5th of July, 2011, you and two

14    co-defendants were indicted on multiple counts of violations

15    of federal law, including conspiracy to defraud the United

16    States, mail and wire fraud, evasion of taxes, money

17    laundering, and identity theft.

18             Some seven months later, on February 13th -- well,

19    more than seven months later, quite a bit later -- on

20    February 13th of 2013, you entered pleas of guilty to the

21    charges in Count One, conspiracy to defraud the United States,

22    in violation of 18 U.S. Code, Section 371;

23             In Count Thirty-One, with aggravated identity

24    theft, in violation of 18 U.S. Code, Section 1028(a); and

25             Then separately, in a one count Information,

1  charging evasion of taxes in violation of 26 United States

2  Code, Section 7201.

3          At this time, I adjudicate you guilty of the two

4  counts in the underlying Indictment, as well as the one count

5  Information for evasion of taxes.

6          And I want to remind you that, except to the extent

7  you may have waived your right to do so under the Plea

8  Agreement, any appeal of sentencing findings would have to

9  be started by filing a Notice of Appeal within two weeks of

10  this date.

11          Do you understand that, sir?

12          DEFENDANT REED:  I do.

13          THE COURT:  Now the Department of Probation --

14  and you've had, certainly, more than one attorney who has

15  represented you during the course of this case, but I believe

16  Ms. Armeni, most recently, has been addressing all of the

17  factors relating to the Presentence Report, and I've received

18  the objections that have been filed by Ms. Armeni on your

19  behalf, as well as the Sentencing Memoranda, and the reply

20  to the government's Sentencing Memoranda, and numerous -- a

21  packet of several letters on your behalf.  But, I want to

22  make sure that there are no remaining factual errors -- and

23  I'll deal with the objections paragraph by paragraph -- but

24  beyond those raised in the objections, whether there are any

25  factual errors in the second revised Presentence Report dated

1   September 26th, 2013.

2           Mr. Damm, are you aware of any factual errors in

3   that report?

4               MR. DAMM:  I am not, Your Honor.

5               THE COURT:  And did you file any responses to

6   the objections at Document 107?

7               MR. DAMM:  I did not.  I rely upon the, the

8   report itself and the response made by the United States

9   Probation Office, Your Honor.

10              THE COURT:  All right.

11          Ms. Armeni, are you aware of any separate or

12  additional factual errors in the Presentence Report as most

13  recently revised?

14              MS. ARMENI:  No, Your Honor.  Nothing in

15  addition to the formal objections we filed.

16              THE COURT:  Okay.  And Mr. Reed, are you -- did

17  you have the opportunity to read the Presentence Report?

18              DEFENDANT REED:  I did, Your Honor.

19              THE COURT:  And did you see any additional

20  factual errors that have not been raised on your behalf by

21  Ms. Armeni?

22              DEFENDANT REED:  No, Your Honor.

23              THE COURT:  Okay.  Well, let's go ahead and

24  turn to the objections that have been filed at Document 107.

25  Originally, of course, and without regard to those objections,

1   Probation, in the most recently revised Presentence Report,

2   had calculated the offense level at a level 33, criminal

3   history category one.  But there are, as I said, objections

4   to that and we should take them one at a time.  The Department

5   of Probation has, in the addendum to the Presentence Report,

6   provided responses to those objections, I believe all of them,

7   but let me make sure.

8           It's not page numbered, but it's an addendum to

9   the Presentence Report dated September 26th, 2013.  The first

10  objection relates to page 12, paragraph number 50.

11          Let me get to that.  And, Ms. Armeni, go ahead

12  and state the essence of your objection to that particular

13  paragraph.

14          MS. ARMENI:  Your Honor, that one was just more

15  of a clarification objection, just so it was clear.  I know

16  that there are a lot of amounts throughout the PSR, and we

17  believed that it was important to differentiate between the

18  actual underlining amount, and then the amount of taxes and

19  interest.  So this objection was purely for that purpose,

20  to just make a clarification, include the actual amount

21  attributed to tax and penalties.

22          THE COURT:  To Mr. Reed, which was $184,206.85.

23          MS. ARMENI:  Well, Your Honor, I believe that

24  Probation changed the, based on my first objection, my

25  informal objections, did change the tax liability as it

1  related to Mr. Toredo (phonetic).  Because, originally,

2  the way the, the way that paragraph read was that the tax

3  liability was Mr. Reed's tax liability, which was incorrect.

4  It's actually Mr. Toredo's tax liability.  Mr. Toredo was one

5  of the clients of APG.

6          So, this $184,206.85 is the interest and penalties

7  attributed to Mr. Toredo.  But, it was just to clarify the

8  total amount.

9          THE COURT:  All right.  And Ms. Buck -- well,

10 Mr. Damm, tell me the government's position on that.

11         MR. DAMM:  Your Honor, we agree with that

12 recommendation.

13         THE COURT:  With, you agree with Ms. Armeni?

14         MR. DAMM:  Yes.

15         THE COURT:  Okay.  All right.

16     And let me ask Department of Probation; is there any

17 clarification you need?

18         PROBATION OFFICER:  No, Your Honor.  It -- no,

19 not if the parties are in agreement.

20         THE COURT:  All right.  Then that change, to the

21 extent it has to be changed, can be made.

22     The second objection, money collected to date,

23 page 13, paragraph 63.

24     Ms. Armeni.

25         MS. ARMENI:  Your Honor, this is two-fold.

1    Again, to clear -- there are actually three parts to this

2    one.  It was, again, to clarify the total amount, and to

3    clarify that 13 million was actually what was owed in

4    September of 2010; and that, again, the tax -- the current

5    tax liability, with penalties, is substantially higher than

6    the 34 million number.  So, again, that was just a point of

7    clarification.  That was one part of the objection.

8              The second is it appears that there's some

9    confusion, understandably, with all of the amounts going

10   on to different people, however, the 14 million IRS liability

11   is not Mr. Reed's personal liability.  That's the liability

12   as a result of the APG transactions.  And I think that

13   paragraph sort of mixed all the liability together and it

14   wasn't clear --

15             THE COURT:  Well, let me ask -- and Ms. Beckner,

16   let me start with you -- ultimately, what is paragraph 63

17   attempting to capture or portray; specifically, with regard

18   to Mr. Reed as compared to the overall conspiracy?

19             PROBATION OFFICER:  Your Honor, I apologize.

20   The paragraph attempted to contain just that, what Your Honor

21   noted.  It was to differentiate defendant Reed's personal

22   taxes owed, and then the losses as a result of the APG

23   conduct, for the total amount then responsible or attributable

24   to this defendant.  Based on the information we had, and

25   as decipherable as that was, we tried to -- apparently,

```
 1   inadequately -- differentiate --
 2              THE COURT:  Well, although --
 3              PROBATION OFFICER:  Well --
 4              THE COURT:  -- you made an admirable effort,
 5   I'm going to let Mr. Damm clarify the position of the United
 6   States.
 7         Mr. Damm, what is the tax liability, first of all,
 8   or the overall loss to the government; and
 9         Secondly, what is the tax liability of Mr. Reed?
10              MR. DAMM:  Your Honor, as of the date of the
11   Plea Agreement, the liability for Mr. Reed was $34,408,751.00.
12              THE COURT:  And Ms. Armeni, do you agree with
13   that or disagree with that?
14              MS. ARMENI:  No, I agree with that, Your Honor.
15              THE COURT:  All right.  Okay.  Then the report,
16   I think, does reflect that.
17         And as to the overall loss suffered by the
18   government, it says $48,408,751.00.  Is that the government's
19   position?
20              MR. DAMM:  It is, Your Honor.
21              THE COURT:  And Ms. Armeni, do you take issue
22   with that, or no?
23              MS. ARMENI:  Well, Your Honor, I know the Plea
24   Agreement called for restitution for a $5 million amount that
25   went to the FTC, and then the 34 million that was Mr. Reed's
```

1    personal tax liability.

2               THE COURT:  Right; that's restitution.  I

3    understand that.

4               MS. ARMENI:  Right.

5               THE COURT:  Okay.  And that the 14 million --

6    plus the 14 million collective tax obligation, the APG scheme

7    derived from the Internal Revenue Service.  I'm sorry is that

8    plus -- is that plus the 34 million?  Is that where we get to

9    the $48 million figure then?

10              PROBATION OFFICER:  Your Honor, it is.  The --

11              THE COURT:  Okay.

12              PROBATION OFFICER:  -- the 34 million figure

13   were the calculated personal federal information tax

14   liabilities of Mr. Reed.

15              THE COURT:  All right.

16              PROBATION OFFICER:  And then the 14 million

17   represented the collective obligation from --

18              THE COURT:  Okay.

19              PROBATION OFFICER:  -- the funds diverted from

20   the IRS through the APG scheme.

21              THE COURT:  And this does not reflect then,

22   these figures do not reflect a restitution figure sought

23   from Mr. Reed under the Plea Agreement then?

24              MS. ARMENI:  No, Your Honor.  The only

25   clarification that we were looking for is, again, with what

1    I had presented in objection one, was the clarification

2    that the stipulated tax deficiency in 2010, when Mr. Reed

3    had owed the money, was in fact 13 million to date, or at

4    the time of the signing of the Plea Agreement.  It is now

5    34 million.  And I'm using that number loosely.

6              THE COURT:  Sure.  Okay.

7              MS. ARMENI:  I know it's a little bit more

8    detailed than that.

9              THE COURT:  All right.

10             MS. ARMENI:  Similar to what we have objected to

11   previously, it was just a clarification of where the numbers

12   were coming from.

13             THE COURT:  All right.

14             MS. ARMENI:  And then we also wanted to include

15   in there -- and I understand Ms. Beckner's position that at

16   the time maybe we did not know how much money Mr. Reed was

17   going to pay in restitution, but we know that it's just under

18   $3 million.  And we noted that that was an important thing to

19   add to this section.

20             THE COURT:  The monies that he had either paid

21   back or helped recover.

22             MS. ARMENI:  Yes, Your Honor.

23             THE COURT:  Right.  Okay.  All right.

24             All right.  Objection 3 seeks a two point -- or

25   addresses, I'm sorry, the two point adjustment for obstruction

1    of justice at paragraphs 64 and 65.

2            Go ahead.

3            MS. ARMENI:  Your Honor, as -- the Plea

4    Agreement did not contemplate the two point obstruction.  It

5    contemplated a lot of other points being added on, but this

6    was not one of them.  It is our position under the guideline

7    3C1.1, that these statements -- this falls under one of those

8    activities that should not be counted as an obstruction and,

9    mainly, because it was not under oath.  Neither of these --

10   basically, there are two events, I believe, that Probation is

11   relying on to come up with this obstruction of justice.

12   And both of them -- neither one were under oath, number one;

13   and, number two, neither one of them significantly obstructed

14   or impeded the investigation.  And I outlined for the Court,

15   and I don't know if the Court wants me to get into each

16   individual, I can certainly do that.  We did outline that --

17           THE COURT:  Well, let me hear, first, the

18   government's position because they may agree.  I don't know

19   what the government's position is.

20           Mr. Damm, in the Plea Agreement, did the government

21   agree not to seek a two point adjustment for obstruction of

22   justice?

23           MR. DAMM:  Your Honor, we did not, although

24   we did not include it either.  But, we do feel that it is

25   an appropriate calculation in this particular case.

1                THE COURT:  Tell me why.

2                MR. DAMM:  Mr. Reed had had contact with the

3    United States prior to the return of the Indictment in this

4    case.  In fact, he came into the U.S. Attorney's Office and

5    sat down with myself and Special Agent Ricky, and tried to

6    persuade us that the activities that he had engaged in with

7    respect to AGE -- not AGE --

8                THE COURT:  AP --

9                MR. DAMM:  -- APG, were not criminal.  And

10   we, respectfully, agreed to disagree with him, but we told

11   Mr. Reed at the time, that based upon his willingness to come

12   in and talk to us, in the event an Indictment was returned,

13   that we would be willing to allow him to self-surrender, and

14   not go out and arrest him.

15               An Indictment was returned, and Mr. Ricky gave

16   Mr. Reed a telephone call.  We had his cellular number.

17   Mr. Ricky gave Mr. Reed a call on the telephone and said,

18   Mr. Reed, we basically have good news for you and bad

19   news.  The bad news is that the Grand Jury has returned an

20   Indictment.  But, the good news is that, as we previously

21   agreed, we will allow you to self-surrender and we will not

22   attempt to arrest you or have the marshals arrest you.

23               Mr. Reed, I believe, was appreciative of this offer

24   on behalf of the United States; represented to Mr. Ricky that

25   he was in fact in Las Vegas and would turn himself in.

13

 1              Thereafter, Mr. Ricky tried to contact Mr. Reed,

 2     and Mr. Reed's cell phone, apparently, had been turned off.

 3     Mr. Reed did not turn himself in.  In fact, as we later

 4     learned, Mr. Reed was not in Las Vegas, as he represented to

 5     Mr. Ricky, but, in fact, was residing in Santa Barbara,

 6     California.  And shortly after that telephone call, Mr. Reed

 7     moved out of his condominium and moved into a low budget

 8     motel in Santa Barbara under an assumed name.  He stayed

 9     there about a week under that assumed name in Santa Barbara,

10     California, and thereafter moved to another low budget motel

11     under an another assumed name.  And it wasn't until Mr. Ricky

12     and other agents from Las Vegas traveled to Santa Barbara,

13     that they were able to locate Mr. Reed and place him under

14     arrest.

15              At the time Mr. Reed was placed under arrest,

16     Mr. Reed had in his possession some -- so many thousands of

17     dollars in cash secreted in his vehicle.  He also had access

18     to a storage unit here in Las Vegas, Nevada, that he rented

19     under another assumed name, and he had close to $500,000 in

20     that particular storage unit.

21              In April of 2011 -- one minute.

22              Yes, in April of 2011, a revenue agent contacted

23     Mr. Reed and asked him whether or not he had any assets.

24     Mr. Reed indicated at that time that -- he stated he had no

25     assets or income.  He had had a $5 million judgment against

1    him from the FTC.  He lost everything.  And a receiver was

2    appointed for the FTC.

3         When asked about his current address, he stated he

4    had no fixed address, but travels between Las Vegas and

5    Goleta, California.  He was asked how he travels when there

6    is no income.  He stated he has friends who help him.  And he

7    states he has a bike to get around.

8         He was advised of the need to provide full and

9    complete financial disclosure, asked to send this information.

10   And he was advised to mail -- well, but the revenue agent

11   asked Reed where to send the information, and Reed told him

12   to send it to a Goleta address, a mail drop that he had there.

13        After Mr. Reed was arrested, he instructed his

14   former wife to obtain the cash that he had secreted in his

15   vehicle, as well as his other possessions, and send them to

16   another attorney here in Las Vegas.  Subsequently, Mr. Reed

17   began cooperating with us and asked that those items be

18   returned to the government from the attorney that was

19   representing him at the time; which, in fact, after some

20   protracted negotiations, did happen; but all of which, in

21   my opinion, substantiates the addition of the two points for

22   obstruction of justice.

23        Mr. Reed was also, as I'm sure will be discussed,

24   hiding somewhere in the neighborhood of $3 million offshore as

25   well, Your Honor, which he later was instrumental in returning

1    to the United States.

2                     THE COURT:  All right.  Or, the 2.4 million.  I

3    can't remember the exact figure.

4               Ms. Armeni.

5                     MS. ARMENI:  Your Honor, the parties stipulate

6    that no other enhancements or reductions, except those

7    described here, should apply in calculating the total offense

8    level.  That is page --

9                     THE COURT:  Okay.  You're quoting from the Plea

10   Agreement Memorandum.

11                    MS. ARMENI:  I am.  That's page --

12                    THE COURT:  Let me get that.

13                    MS. ARMENI:  -- page 5.  It's Document 57,

14   page 4, line 5.

15                    THE COURT:  Okay.  Hold on.  I've got the Plea

16   Agreement here.

17               Page again?

18                    MS. ARMENI:  Page 4, line 5.

19                    THE COURT:  Oh, line 5.  I'm sorry.

20          "The parties stipulate that no other enhancements

21   or reductions, except those described here, should apply."

22               What about that, Mr. Damn?

23                    MR. DAMM:  Your Honor, I agree with Ms. Armeni

24   that that's the agreement that the United States entered

25   into.  I was only responding to the calculation made by the

1   Probation Department.

2            MS. ARMENI:  And, Your Honor, he went well

3   above what Probation, the two bases that Probation relied on

4   for the obstruction of justice.  I'm more than willing to

5   respond to all of his arguments.

6            THE COURT:  Well, these are addressed in the

7   Sentencing Memoranda I think the parties have filed back

8   and forth as I recall, because I recall reading pretty much --

9            MR. DAMM:  Your Honor, if it might help resolve

10  the issue, we are not requesting that this application be

11  applied in our sentencing recommendation; however, I've

12  provided the Court with the facts that I believe that the

13  Probation Department relied upon.

14           THE COURT:  Well, here's what I would do to

15  clarify things and simplify things, because I think all of

16  the conduct that you all have discussed in the competing

17  Sentencing Memoranda, and what you will present in your

18  arguments regarding sentence, clearly, would encompasses

19  that.  But, I agree with Ms. Armeni that given the language

20  in the Plea Agreement Memoranda, at page 4, lines 5 and 6,

21  that the enhancement under Guideline Section 3C1.1, objection

22  to that will be sustained, and that will not be formally added

23  to the advisory guideline calculation.  So, that will alter

24  the ultimate calculation of 33 when we get to the final

25  determination.

1        All right.  The next objection then, objection 3 is

2    sustained.

3              Objection 4 --

4              MS. ARMENI:  And, Your Honor, I could probably

5    speed this up a little bit.

6              THE COURT:  Yeah.

7              MS. ARMENI:  Objection 4, 5, 6 and 7 all sort of

8    are in direct relation --

9              THE COURT:  Hinge on the obstruction?

10             MS. ARMENI:  Yes, Your Honor.

11             THE COURT:  Yeah, so those would be sustained

12   and the adjustments would be made, and the total offense level

13   would be 31 rather than 33.

14             So, Ms. Beckner, that would be the change on

15   paragraph 76, I think it is, on page 17.

16             All right.  And then at paragraph 7, that would --

17   I'm sorry, objection 7, that would also impact the advisory

18   guideline range and move it to a range of 108 to 135.  Okay?

19   That's at paragraph number 134.  I think 134 through 136.

20             All right.  Objection 8 --

21             MS. ARMENI:  And, Your Honor, if the Court would

22   allow, I would prefer to maybe keep objection 8 and objection

23   9 because they are going to be part and parcel of what we're

24   going to be arguing for.

25             THE COURT:  Well, they speak to what you argue

1   as the ultimate sentence --

2                    MS. ARMENI:  Yes, Your Honor.

3                    THE COURT:  -- not to a change in the

4   Presentence Report per se.  So, I'll allow that.

5           Objection 10, special condition of mental health

6   treatment programming.  Shouldn't that really be the same

7   thing?  What that is is a recommendation by Probation.  It's

8   not a factual finding or a guideline calculation, as much as

9   a recommendation.  But, if you wish to argue it --

10                   MS. ARMENI:  Your Honor, our position is

11  simple.  There's nothing in the PSR or any of the facts that

12  suggest that Mr. Reed needs mental health treatment.  There's

13  certainly several other conditions that we have not made an

14  issue of, but Mr. Reed is willing to participate in.  There's

15  just no basis for this and it's just --

16                   THE COURT:  I'll let the parties argue that when

17  you argue the sentence in terms of the terms of months and so

18  forth.

19          Now, restitution, this is something we do need to

20  get clear because there's an awful lot of money being thrown

21  about here.  And I think it's important that for purposes

22  of restitution, we know precisely what it is that either the

23  parties contemplated, and what is being sought in the way of

24  an order of restitution as a condition of any sentence the

25  Court imposes.

1              So, Ms. Armeni, go ahead and give me your take on
2    that and then I'll let Mr. Damm respond.
3              MS. ARMENI:  So, Your Honor, our position is
4    based strictly on, again, the Plea Memorandum.  On page 5,
5    lines 5 through 13, there is a discussion about restitution
6    within that paragraph.  There is a discussion of the
7    $34,048,751.00 amount that --
8              THE COURT:  To the Internal Revenue Service.
9              MS. ARMENI:  -- to the Internal Revenue Service,
10   which I --
11             THE COURT:  And then five million seven hundred
12   thousand plus to the FTC.
13             MS. ARMENI:  Yes, Your Honor.
14             THE COURT:  And that is the sum and substance
15   of your client's restitution obligation within the confines
16   of the Plea Agreement.
17             MS. ARMENI:  Yes, Your Honor.
18             THE COURT:  And Mr. Damm, do you disagree with
19   that?
20             MR. DAMM:  I do not, Your Honor.
21             THE COURT:  And Ms. Beckner, does your report
22   recommend otherwise?
23             PROBATION OFFICER:  It does, Your Honor.
24   However, this is, as I think obvious, this is a very
25   complicated matter and --

1      THE COURT:  Yeah.  Well, I'll save you some

2 time.  I'll go ahead and adopt what's agreed to in the Plea

3 Agreement of those two figures; that is, restitution -- and

4 Eileen, you'll want to write this down, too -- restitution to

5 the Internal Revenue Service of $44,408,751.00, and to the

6 Federal Trade Commission in the amount of five million seven

7 hundred fifty-two thousand -- $752,093.77 to the FTC.

8      So, that saves some time in terms of -- I mean,

9 we're talking about enormous sums of money which we know,

10 everybody in this room knows, will never be collected, nor

11 could it be collected, I think, but -- all right.

12      Are there any other objections that we did not

13 address, Ms. Armeni, that you had?

14      MS. ARMENI:  No, Your Honor.

15      THE COURT:  Okay.  Well, then the offense level

16 formerly calculated at a 33, would now be deemed a 31.  And as

17 I indicated, that would alter the available sentencing range

18 previously calculated.

19      What would the new range now be?  Instead of 135 to

20 168, it would now be 108 to 135.

21      Am I correct, Ms. Beckner?

22      PROBATION OFFICER:  You are, sir.

23      THE COURT:  And would that -- that would not

24 affect the potential supervised release range of three years?

25      PROBATION OFFICER:  No, sir.  That would remain

-21

1   the same.

2                    THE COURT:  And the fine range -- which, again,

3   is I think not a posit, but would that now be modified from

4   seventeen five to 175,000, to a lesser amount?

5                    THE COURT:  It would, Your Honor.  The new fine,

6   applicable fine range would be fifteen thousand to $150,000.

7                    THE COURT:  Okay.  And it would not have any

8   implications on the mandatory penalty assessment of the

9   restitution.

10                   Okay.  Fair enough.  So that's the range, under

11  the advisory guidelines, that we have to work with.  But, of

12  course, we have the Sentencing Memoranda.  So what I would

13  like to do is let you, Ms. Armeni, make your argument as to

14  the sentence that you think should be imposed.  I'll then let

15  Mr. Damm address that subject.  And then I'll let you reply

16  briefly, as you've done in the Sentencing Memoranda.  And

17  then I'll hear from you, your client, if he wishes to speak.

18                   MS. ARMENI:  And, Your Honor, while we're on

19  that subject, Nancy Reed, Mr. Reed's sister, is here and would

20  like to just address the Court very briefly.

21                   THE COURT:  Yes.  I did have a message from my

22  clerk to that effect.

23                   MS. ARMENI:  And I did give Mr. Damm notice.  I

24  don't know at what part of the proceeding you would like her

25  to speak.

1          THE COURT:  I think after you all have made your

2   arguments, it would make sense.  And then, of course, hearing

3   from your client as well.

4          But, go ahead.  I've read your Sentencing Memoranda

5   and, again, the many letters submitted on behalf of Mr. Reed.

6          MS. ARMENI:  Thank you, Your Honor.

7          And, Your Honor, I know that the Court is very good

8   about reading through everything and is very thorough, but I

9   think there are a couple of points I do want to touch on

10  specifically.

11         We are asking for a sentence of 72 months.  We

12  believe that is a sentence that is sufficient but not greater

13  than necessary.  And here's some reasons why:

14         In the last two-and-a-half years, while Bill has

15  been sitting at the Henderson Detention Center, I think he

16  has shown why he is different than a lot of other defendants

17  who stand before this Court.  He has participated in the Life

18  of Crime Program for every month since he has been there.

19  And the reason that that's important is because of the impact

20  that he is already having on people.

21         When I was reviewing the guidelines for these

22  tax cases, part of the concern and the theory behind the

23  guidelines and punishment, is this idea of deterrence of other

24  people.  A lot of people violate the laws as they relate to

25  taxes.  A lot of people aren't truthful with the IRS with

1    their taxes.  And so the purpose behind the guidelines is

2    really to deter other people.  If they see people like Bill

3    and say, oh, I see that he got in trouble.   I certainly

4    don't want to do that myself.  And the Life of Crime has

5    allowed him to start this process; this process of deterring

6    other people and the impacts.  Judge Hampton wrote a really

7    nice letter, many letters, talking about the impact that

8    Bill has on these children.  It's probably estimated about

9    800 children have been part of this Life of Crime Program in

10   the last year.  And when Bill sits there and talks to them,

11   the first thing he tells them is that he's in trouble and

12   what he is in trouble for.

13         So if one person, one young person -- or one adult,

14   for that matter, because the parents are in the room when

15   these children are going through this Life of Crime Program --

16   if one person is persuaded that, you know what, I need to pay

17   my taxes.  I need to be truthful with the IRS.  Bill, Bill

18   speaking at the Life of Crime Program has deterred, as acted

19   to deter people from committing these crimes.

20         The other thing Bill has done, and I -- one more

21   point -- I know that the program report -- and I understand

22   they're looking at very limited facts.  And in looking at the

23   crime itself, they, I think they use the word "greed."   I

24   think the letters show a very different person, the character

25   letters.  And, in fact, when describing Bill in this Life of

1    Crime Program, I think the words that were used were courage

2    and unselfish for him getting up there and speaking about

3    where he is in life and how he got there.

4            The other thing that Bill has done that I don't

5    think I have ever seen anybody else do, is he's written

6    two books and a screenplay while in custody.  One has been

7    published, and one is well on its way to being published.

8    And the reason that the books are important, Your Honor, is

9    because the books alone perhaps will not generate the money.

10   I think the Court posed the question will we ever see this

11   restitution again?  The Court is right.  It is a lot of money.

12   And the reality is probably not dime for dime or dollar for

13   dollar will be paid back.  However, this is an opportunity

14   for Bill to at least try to pay back some money because what

15   the books allow him to do is when he's released from custody,

16   it will allow him a better position to get on the speaker

17   circuit.  And I believe Nancy Reed is going to talk a little

18   bit about this.  The speaker circuit will allow him to go

19   around and talk about his books.  And the books focus on

20   positive energy.

21           And, again, while he's on the speaker circuit, he's

22   going to be talking about I've been in prison for so many

23   years.  This is what I did wrong.  This is what I was

24   convicted for.  Again, showing people that when people

25   evade taxes and do other things -- I'm not saying that's

Case 2:11-cr-00247-JAD-CWH  Document 116  Filed 11/27/13  Page 25 of 72

1  the obligation to the IRS -- but there are consequences.  And

2  this is another way to act as a deterrent.  And it also is a

3  way to generate money, generate money that while Mr. Reed is

4  on supervised release to pay his obligation, his financial

5  obligation.  This speaker circuit will allow him to do that,

6  and he's already put the wheels in motion, so to speak, to get

7  that -- to have that out.

8          You know, most people could have sat in jail and

9  thought, you know what, I know I'm going away for a couple of

10  years.  What am I going to do?  I'm just going to wait until

11  I get out.  But, that's not what he did.  And I think that's

12  very different than most people that come before this Court.

13  He has shown to the Court, and to everybody else, that despite

14  this situation, he's accepted responsibility, but he is moving

15  on and he is looking out to the future and what is going to

16  happen in the future.

17          And six years, Your Honor -- we're asking for

18  six years -- six years is a significant amount of time;

19  especially, to somebody that has never been in trouble

20  before.  This is his first felony.  He's 63-years-old.

21  This is the first time he's had to sit in prison and he's

22  already been in there two-and-a-half years.  This is serious

23  consequences for him.

24          His boys are here, Kirk and Jack.  He is very, very

25  close to them.  This has shown him another deterrent for the

26

1    Court to look at; you know, recognizing that his actions not

2    only are impacting him, but he's now sitting in a jumpsuit in

3    front of his sons.  That's an embarrassing situation for him,

4    and he will never put himself in that situation again.

5           He's got his 88-year-old mother in court today,

6    Donna, and Ms. Reed.  Again, he wants the opportunity to be

7    able to get out in a reasonable time.  He realizes that he

8    has to do time, Your Honor.  We're not disputing that.  That's

9    not the situation that we're in.  But, the opportunity to get

10   out -- I think the Court read letters from his brother and his

11   sisters, because of the mom's, the mother's situation, they

12   need help.  Everybody has to pitch in.  It's all hands on

13   deck.  And they were such an integral part of that hands on

14   deck and has been pulled away from that, and so it's put a

15   lot of stress on the other siblings.

16          You look at age.  You look at his education.  These

17   are all things that the Federal Sentencing Commission has

18   looked at to say recidivism rates; much lower when you have

19   somebody that is 63-years-old.  His education shows, again,

20   that he can move forward, that he can put this behind him and

21   continue forward when he gets out and make a difference.  He

22   has the ability to make a change.

23          And, Your Honor, the other thing that is probably

24   more of a touchy subject and, unfortunately, it has to come to

25   the Court in this way, is his cooperation.  I came into the

27

1    case, as the Court recognized, a little bit late.  The Plea

2    Agreement was already signed.  I had nothing to do with it.

3    I wasn't involved with any of the cooperation.  So, I had to

4    sort of come up to speed with what was going on.  And in

5    coming up to speed, what I realized was that there was at

6    least seven meetings and over 23 hours of cooperation.  But

7    before that, I think what is the most -- and out of everything

8    he did, probably the most burdensome part is not the money.

9    The burdensome part is sitting at the Henderson Detention

10   Center for the last year-and-a-half.  And as the Court may

11   already know, he's been sitting there in anticipation that

12   he's going to testify at Mr. Waite's trial that is currently

13   scheduled for January of next year.

14                THE COURT:  Correct.  Yeah.

15                MS. ARMENI:  However, more recently, I believe

16   in September, Mr. Waite was indicted on new charges with two

17   new defendants, and the government has advised me that that

18   was also another trial that they were looking at Mr. Reed to

19   testify in.

20                So put bluntly, Your Honor, the end is nowhere in

21   sight.  And he is sitting over there in a jail cell with no

22   yard to go out in, no in-person contact, no outside -- it's

23   basically --

24                THE COURT:  Let me ask you --

25                MS. ARMENI:  Sure.

1          THE COURT:  -- in that regard, because there's

2    no requirement that a person, once sentenced, would remain

3    in a pretrial detention facility.  He would be sentenced,

4    designated, and go to whatever facility.  If he were to

5    testify subsequently, he would be returned for purposes of

6    that trial.

7          Did you understand differently?

8          And Mr. Damm, do you understand differently?

9          MS. ARMENI:  Well, I did understand differently.

10   I mean, I under -- no, he would have been transported.  But

11   it is the government's position, and they -- when this

12   came about and we said, you know what, enough is enough.

13   Mr. Reed -- it's not fair to ask Mr. Reed to continue to sit

14   at the Henderson Detention Center.  I expressed that to the

15   government and said he is on board to cooperate.  This does

16   not change any of the cooperation.  I was asked twice, on two

17   separate occasions, that I reconsider my position and Mr. Reed

18   not get sentenced --

19          THE COURT:  Okay.

20          MS. ARMENI:  -- because --

21          THE COURT:  Mr. Damm, let me ask you.  It's

22   not -- is it the government's position that once sentenced

23   here today, that Mr. Reed, for any reason, would be required

24   to remain at the detention center and not designated and

25   transported and brought back on a necessary Writ of Habeas

1    Corpus or Writ of Habeas Corpus Ad Testificandum?

2              MR. DAMM:  No, Your Honor.

3              THE COURT:  Okay.  He won't, he won't have to

4    remain?

5              MS. ARMENI:  No, he won't.  And that's why we're

6    here.  That's why we asked to be sentenced, Your Honor, yeah.

7              THE COURT:  Okay.  I just wanted to make sure.

8              MS. ARMENI:  No, my concern is in the future.

9    My concern -- I guess the point in me telling you about the

10   future, Your Honor, is why we brought it to the Court and why

11   we are sort of saying, okay, we're ready to be sentenced.

12             THE COURT:  Understood.  Okay.  Understood.

13         I can understand where sitting in a pretrial

14   detention facility for 27 months is a long time.  And the

15   delay, of course, has been something the parties have

16   stipulated to throughout, since the plea was, at least since

17   the plea was entered.

18             MS. ARMENI:  But --

19             THE COURT:  But --

20             MS. ARMENI:  -- I think it's an important

21   factor, Your Honor, because for the government to now say

22   that Mr. Reed has not cooperated, which I believe is what

23   they're probably -- or substantially cooperated, using the key

24   word, for them to now come up and say what I am anticipating

25   they're going to argue --

1              THE COURT:  Well, much of your sentencing

2    memorandum, and I understand it, goes to the cooperation

3    provided and Mr. Damm's response to the government's

4    perspective on the cooperation provided.  We all know,

5    notwithstanding the standards you cite as to whether the

6    government should or should not have filed a 5K1.1, that this

7    is discretionary with the government.  But, we also know that

8    the very arguments you raise are legitimate factors the Court

9    can consider in fashioning an appropriate sentence, without

10   regard to whether the government has filed a 5K1.1 motion.

11             MS. ARMENI:  Right, Your Honor.  And that's what

12   we're doing.

13             THE COURT:  You're not seeking me to order the

14   government to file --

15             MS. ARMENI:  No, no, no, no.

16             THE COURT:  -- a 5, because I couldn't.

17             MS. ARMENI:  I wish I could.  But, no, no, Your

18   Honor, that's certainly not what we're seeking.  We're seeking

19   for you to consider the cooperation --

20             THE COURT:  All right.

21             MS. ARMENI:  -- the extent of the cooperation --

22             THE COURT:  -- and the perspective cooperation.

23             MS. ARMENI:  And the perspective.

24             THE COURT:  Right.

25             MS. ARMENI:  So, Your Honor, we talked about the

1    Henderson Detention Center and him being in there for the

2    27 months, I think as the Court noted.

3              And then the restitution, the $3 million, which is

4    extraordinary and voluntary restitution.  A big chunk of this

5    money was paid or -- and when I say "paid," let me back up.

6    Most of this money was in offshore accounts.  This Court has

7    a lot of experience with offshore accounts, and it takes a

8    while.  You don't just make a phone call and say, hey, send me

9    the money back and we're going to do it.

10             So, a lot of the cooperation did deal with Bill

11   sending e-mails at the request of the government, and letters,

12   and going back and forth to different accounts.

13             THE COURT:  I may have read it wrong, but I

14   thought it was somewhere in the neighborhood of two million

15   four hundred thousand was in offshore accounts; and the other

16   five hundred and some odd thousand was domestic.

17             Am I right?

18             MS. ARMENI:  That's correct, Your Honor.

19             THE COURT:  Okay.

20             MS. ARMENI:  And so the majority of money was

21   paid before the plea in this case.  The remaining money was

22   paid before sentencing.  They were working on it when the plea

23   had taken place, but hadn't brought it back yet.

24             THE COURT:  Right.

25             MS. ARMENI:  So, Your Honor, we submit to the

1    Court that this, again, was cooperation.  The Plea Agreement

2    actually outlines, in the Cooperation Section, that Mr. Reed

3    do an accounting of what he has done, and also turn over any

4    money -- which he did.  And, Your Honor, the Court can, in

5    reviewing things, can look at this and say, okay, this goes to

6    his acceptance of responsibility.

7              I understand it's his debt.  We're not asking you

8    to say, oh, you know, we paid the three million.  Great.

9    You know, you paid what you were supposed to do.  We know

10   he was supposed to pay that.  But, he worked really hard to

11   get that money back.  It shows that he's willing to accept

12   responsibility for his actions and beginning the process of

13   making a wrong a right.

14             Your Honor, and then the last, the last issue of

15   cooperation is this testimony.  And I think the Court probably

16   has a good sense of this case.  This case became known to the

17   FTC in about 2006.  IRS got involved --

18             THE COURT:  This is the Colorado case?

19             MS. ARMENI:  Well, I'm going to get to that,

20   but I'm going to just talk about this case, Mr. Reed, in the

21   District of Nevada.

22             The APG activities came to the attention of the FTC

23   in 2006.  The IRS got involved in '07.  In 2008, they advised

24   Mr. Reed that he was a target of an investigation, taking a

25   couple more years before they actually indicted him.  But

1    the reason it's important is because from 2008 on, Mr. Reed

2    did have communication with the government in the District of

3    Nevada.  And in about 2010, while Mr. Reed was still a target

4    of a criminal investigation, as relayed to him by Special

5    Agent Ricky, Agent Ricky called him and said, hey, I have a

6    subpoena for you out of the District of Colorado.  Mr. Reed

7    came into the office.  He debriefed with Special Agent Ricky,

8    the agent in this case, as well as the U.S. attorney for

9    Colorado.

10            After that debriefing -- the debriefing was two

11   hours or so -- he then became a government witness.  And he

12   went down to Colorado, where he was no longer living, and

13   testified as a government witness.

14            Now it is a rare occasion, as I'm sure this court

15   has seen -- and we actually gave some statistics.  About

16   88 percent of people that testify in cases normally get some

17   sort of downward departure.  And, in fact, I know this court

18   has seen a lot of the mortgage fraud cases and there have been

19   a lot of defendants that testify and received the benefit of

20   some sort of departure for testifying.

21            THE COURT:  A great many.

22            MS. ARMENI:  So for there not to be one, not

23   even one point assessed, or not any, any, any, any credit

24   given to Mr. Reed for, essentially, being a government witness

25   while a target in the investigation, while being told anything

1  you say will be used against you in our District of Nevada

2  case, he should be allowed -- I mean, he should be given some

3  credit for that.

4         So, Your Honor, with the cooperation and sort of --

5  I did highlight some of the facts about the deterrence, why

6  he's, why he's being deterred from future crimes, why he will

7  not be a danger to the public; and, in fact, probably be an

8  asset to the public more so than anything.  And for those

9  reasons, Your Honor, we believe that a sufficient but not

10  greater sentence is 72 months.

11         THE COURT:  All right.  Thank you, Ms. Armeni.

12         Mr. Damm, let me hear your response and your

13  proposal as to the specific sentence which you think is

14  indicated in this case.

15         MR. DAMM:  Certainly, Your Honor.

16         Your Honor, I don't disagree with much of what

17  Ms. Armeni has to say.  Her pleadings, though, have indicated

18  that she feels that somehow the United States has improperly

19  withheld making a motion for a 5K downward departure --

20         THE COURT:  Well, now, she may indeed view it

21  that way, but she also acknowledged -- and that's why I raised

22  it up-front -- this is not a situation about Ms. Armeni's

23  views about the propriety of the government's failure to file

24  a 5K1; or, for that matter, about your view as to whether you

25  were appropriate in not filing a 5K1.1.  You both have the

1    opportunity to argue the merits of whatever was done in

2    mitigation; or, as you've already mentioned, things which

3    are aggravating, like, moving around a bit and avoiding

4    detection, and things of that sort, which did not result in

5    a guideline obstruction of justice, but which you rightfully

6    can argue reflect upon the factors which the Court should

7    consider in sentence.

8          So I think, really, what I'm concerned with is not

9    whether we call it a 5K1.1, but what occurred.  And, you know,

10   5K1.1 is not antiquated.  The guidelines aren't antiquated.

11   They're still cognizably, still mean something, but they're

12   advisory.  And we really have to focus on the underlying facts

13   and what occurred.  So it really doesn't matter to me what

14   either of you think about 5K1.1.  I don't really care.  There

15   isn't a 5K1.1.  If you thought there should have been, you

16   would have filed one, I would have dealt with it, and I would

17   be looking a the same underlying facts.

18         Tell me about, you know, your argument as to the

19   degree of cooperation provided, the perspective cooperation,

20   the mitigating and aggravating factors that you think argue in

21   favor of a sentence of X, Y, or Z.  I think it was 144 months

22   you argued for in your memorandum.  I can't, I can't recall

23   specifically.

24         MR. DAMM:  Your Honor, what we're prepared to

25   recommend to the Court is the low end of the guideline

1    range, as calculated by the Probation Department, which is

2    108 months.  And then, of course, there's the statutory

3    24-month sentence for aggravated identity theft.

4                    THE COURT:  All right.  So 132 is the bottom

5    line recommendation the government makes?

6                    MR. DAMM:  That's correct, Your Honor.

7                    THE COURT:  Okay.  Go ahead and tell me your

8    rationale for that.

9                    MR. DAMM:  Your Honor, Mr. Reed engaged in

10   his activities with APG for over eight years.  And during

11   that eight-year time period, he and Mr. Neiswonger violated

12   injunctions that had been imposed by the Federal Trade

13   Commission.  Mr. Reed avoided paying federal income tax for

14   himself, which he has admitted and now -- or at the time of

15   the signing of the Plea Agreement, amounted to an outstanding

16   tax liability of $34 million.

17        Mr. Reed helped others avoid paying their taxes to

18   the IRS, to the tune of at least $14 million.  And Mr. Reed

19   was the consummate conn artist, who was defrauding the

20   government for an extraordinarily long period of time.

21        Now, Ms. Armeni, and appropriately so, recognizes

22   all of the things that Mr. Reed did after he got arrested.

23   It's interesting that defendants certainly seem to have a

24   change of heart once they're in custody.  And it appears to

25   be certainly so for Mr. Reed.  But, it's important to note

1    what Mr. Reed did.

2           As I've alluded to earlier, in discussing the

3    contact he had in April of 2011 with the IRS, where he

4    basically said he was destitute.  He didn't even have a car.

5    He didn't have a place to live.  He got around on bicycle.

6    All while knowing that he had, he had a car; he had $70,000,

7    or more than $70,000 worth of cash in that car; he had a

8    storage unit here in Las Vegas just off of Buffalo and Sahara,

9    with close to $500,000 in cash in it.  This was not your

10   typical storage unit where somebody would store furniture or

11   other household belongings.  Mr. Reed, I believe, probably

12   rented the smallest unit possible.  The storage unit had two

13   suitcases in it and a little table and a little chair.  And

14   in one of the suitcases were envelopes, each filled with

15   $9,000 in cash, for a total of close to $500,000.

16          Mr. Reed, also, as I've indicated, in April of 2011,

17   said that he was destitute; when, in fact, we know that he

18   had money overseas amounting to, as the Court has recognized,

19   somewhere in the neighborhood of $2.4 million.  Now that money

20   was overseas, and it was held in the name of various entities

21   that Mr. Reed had established.

22          Now, one of the things that Ms. Armeni has said in

23   her pleadings, that Mr. Reed has turned over all of the, the

24   assets that he acquired either before, during, and after the

25   operation of APG.  And I would like to think that that is

1    true, but we have no way of knowing whether or not there are

2    other assets out there in the names of other entities that

3    we have not discovered or uncovered.  And we -- the only

4    person that would know that would be Mr. Reed.  And Mr. Reed,

5    of course, has not been the most stellar character in terms

6    of providing truthful information to the United States

7    Government.  It's only after he was arrested that he has,

8    has decided to cooperate.

9         Now I, I do find it remarkable that he did return

10   close to $3 million to the United States.  That's a large

11   amount of money.  There's no doubt about it.  But the case

12   that Ms. Armeni relies upon involved a case where the

13   defendant returned 129 percent of the theft.  In this case,

14   Mr. Reed has only scratched the surface; the three million,

15   by my calculation --

16         THE COURT:  Eight percent or something.

17         MR. DAMM:  -- a little over, a little over

18   eight percent.  So, although the figure itself is huge, the

19   percentage amount is not.

20         And Mr. Reed defrauded the United States out of a

21   lot of money.  And it's noteworthy that he's made attempts to

22   pay some of that back.  And we recognize that.  But we also

23   recognize, and I guess I don't need to go over this ground

24   again, but it's, but it's not 5K material.  I certainly don't

25   have any objection to the Court considering it in terms of the

1    variance or perhaps some undefined downward departure ground,

2    but it's just not a 5K.

3          Also, counsel made a big issue of Mr. Reed's

4    testimony in Colorado.  Mr. Reed's testimony, which I've

5    reviewed a number of times, involved an entity that his wife

6    owned called Legal Forms Plus.  And Mr. Reed said he didn't

7    have any association with that company.  He just kind of

8    helped out and acted as a nominee for individuals that wanted

9    to form corporations.  That company, according to Mr. Reed's

10   testimony, was incorporated in 1995; and the last date in

11   the testimony that's reflected is August of 1998.  So, that

12   was well before the establishment of APG, which, according

13   to the Presentence Report, indicates that APG was formed in

14   October of 1998, and the Receiver took over in January of

15   2007.

16         So Mr. Reed's testimony in Colorado, Your Honor,

17   could -- I suppose is worthy of mention.  But, again, it was

18   testimony not regarding any criminal culpability that Mr. Reed

19   faced in the APG case, but it was in an unrelated matter.

20   Mr. Reed testified he didn't even know the defendant in that

21   case.

22         And I suppose we could dredge up any number of

23   good deeds, perhaps, that Mr. Reed performed prior to his

24   Indictment in this case.  But the Indictment in this case

25   came well after his Colorado testimony, and certainly the

1    Plea Agreement in this case didn't contemplate testimony

2    that was provided even prior to Mr. Reed being indicted; and,

3    certainly, prior to his entry into the Plea Agreement.

4              With respect to the pretrial detention, Your Honor,

5    it's unfortunate, but some of these white collar crime cases

6    take an extraordinary amount of time to get to trial.  But

7    Mr. Reed was engaged in criminal activity for, as I've

8    indicated, eight years plus.  And so it's unfortunate that

9    he's remained in the Henderson detention facility, but it's

10   also a situation that he contemplated.  And as recognized in

11   the Plea Agreement itself, as I pointed out to the Court,

12   Mr. Reed agreed to waive any speedy sentencing until the

13   United States would be able to fully assess his cooperation

14   in terms of the 5K.  But, I suppose we're beyond that point

15   now.

16             Mr. Reed also reported to the Pretrial Services

17   Office -- and this is at paragraph 117 in the Presentence

18   Report -- that since 2006, he was -- had been acting in the

19   capacity of an investment counselor, slash, manager for a

20   few individuals.  And at the time of this arrest, he reported

21   to Pretrial Services that he was earning about $3,000 monthly.

22             Well, it's interesting to note that Mr. Reed's 2007

23   through 2012 federal income tax returns, Your Honor, Mr. Reed,

24   in 2007 and 2008, reported adjusted gross income for each of

25   those years of $100; and from 2009 to 2012, reported zero

1    income for each of those years.

2            Your Honor, Mr. Reed -- and I don't mean in any way

3    to diminish the steps that he's taken since his arrest but,

4    Your Honor, those have to be viewed in the light, number one,

5    that Mr. Reed is in custody.  I've related to the Court the

6    troubles that the United States faced in trying to apprehend

7    Mr. Reed.  Mr. Reed promised -- or we promised Mr. Reed that

8    we wouldn't go out and arrest him, and we'd give him the

9    opportunity to turn himself in.  We made the same promise to

10   Mr. Neiswonger, Mr. Reed's co-defendant.  Mr. Neiswonger did

11   the same thing that Mr. Reed did.  He came in and talked to

12   us, and we made the same promise to him.  I told him we

13   appreciate your coming in.  I told Mr. Reed we appreciated

14   his coming in.  And I said, I said, as a consequence of your

15   forthrightness, in coming in and visiting with the United

16   States, we will let you know ahead of time if an Indictment

17   has been returned, and allow you to turn yourself in.

18           Mr. Reed took a far different course than

19   Mr. Neiswonger when this opportunity was afforded to him.

20   He adopted a false identity, moved into one location, after

21   a week adopted another false identity and moved to another

22   location.  In fact, at the time of Mr. Reed's arrest, he had

23   five different wallets in his possession, all with different

24   identities.  He had the identity of his deceased father.  He

25   had the identity of his brother.  He had one identity in his

1    own name.  And then he had two other wallets with the names

2    of other individuals.

3         Mr. Reed was not intent upon assisting the

4    United States until presented with the reality that he was

5    in custody and would be facing a very long prison sentence.

6    It's only until Mr. Reed got to that point that he's decided

7    to cooperate.

8         I appreciate the cooperation that Mr. Reed has

9    given.  I look forward to affording him the opportunity to

10   testify against Mr. Waite in one or two trials.  And I look

11   forward to the opportunity to evaluate Mr. Reed's cooperation,

12   to share it with the Departure Committee in the United

13   States Attorney's Office and, if so approved, to make a

14   recommendation, at the appropriate time, for a downward

15   departure.  But, we're not there yet.

16        At this point in time, Your Honor, I feel that the

17   low end recommendation of the federal Sentencing Guideline

18   sentence, as calculated by the Probation Department, is

19   the one that is appropriate for Mr. Reed.  It gives him a

20   substantial break from the original sentence recommended by

21   the Probation Department, which I believe was 135 months,

22   which was above, 15 months above the statutory break that we

23   gave to Mr. Reed.

24        We didn't force Mr. Reed to plead to offenses --

25             THE COURT:  Well, I think Probation had

43

1  recommended 144 months.

2          MR. DAMM:  Well, that's -- that, I think,

3  includes the --

4          THE COURT:  That was the goal-able sentence.

5          MR. DAMM:  Right.

6          THE COURT:  Total term.

7          MR. DAMM:  But I'm focusing just on the

8  statutory 120 months for the two offenses, the tax offenses,

9  and then the 24 months that's added on top of that.

10          THE COURT:  That's how they got there.  That is

11  exactly --

12          MR. DAMM:  We recommend the low end of the

13  Sentencing Guideline range --

14          THE COURT:  Right.

15          MR. DAMM:  -- for all of the issues that I've

16  mentioned and related to the Court.

17          THE COURT:  All right.  Thank you, Mr. Damn.

18      Ms. Armeni, I'll hear anything you wish to say in

19  reply, and then from the defendant's sister and the defendant.

20          MS. ARMENI:  Well, Your Honor, the 144 months,

21  I believe, was Probation's original recommendation with the

22  two point obstruction included.

23          THE COURT:  Correct; it was.

24          MS. ARMENI:  Right.  Okay.

25          THE COURT:  No, it was 60 -- 60 months,

1  60 months consecutive on Counts One and Thirty-one, I think

2  it was.  And then -- no, I'm sorry -- yes, that's right.

3                 MS. ARMENI:  Right.  So is the government --

4                 THE COURT:  No.  No, I apologize.  It was

5  60 months on Count One, 60 months on the separate information,

6  and then 24 months on Count Thirty-one consecutive.

7                 MR. DAMM:  Your Honor, what I, what I was

8  trying to point out is that the actual guideline calculation

9  was higher than the statutory limit by 15 months.

10                 THE COURT:  Right.  Yeah, I understand.  I

11  understand.

12                 MR. DAMM:  All right.

13                 THE COURT:  That could have been, under the

14  old guideline calculation, the top of that was 168.  But you

15  could not reach it, you couldn't reach that guideline.

16  That's, again, a separation, where our guidelines oftentimes

17  are artificial as compared to what -- the statute trumps it.

18                 MR. DAMM:  Well, and that was contemplated by

19  the United States when we, we decided upon the charges.

20                 THE COURT:  When you negotiated.  Sure.  I

21  understand that.

22                 MR. DAMM:  Right.

23                 THE COURT:  Yeah.  Yeah.  Okay.

24                 MS. ARMENI:  Okay.  Well, Your Honor, I think

25  the most important thing Mr. Damm said, from our perspective,

1    was they have no objection to considering a variance when we

2    were discussing some of Mr. Reed's cooperation.  But, I know

3    it's easier to say there's a change of heart after arrest

4    because, a lot of times, we see defendants cooperate after

5    arrest.  However, by my --

6                    THE COURT:  I rarely see otherwise.

7                    MS. ARMENI:  You do, Your Honor, but I, I

8    will tell the Court, and I have six communications with the

9    government before he was arrested, where he met -- one of

10   those communications was a three-hour meeting.  So, he did

11   cooperate prior to him actually being indicted on this case.

12   So, this is not a, yes, I'm not going to disagree with the

13   substantial cooperation came after the fact, but there was

14   definitely some intention to cooperate from the very

15   beginning, especially with the first hour being -- the first

16   meeting being three hours.

17        The other thing I think is sort of important to

18   mention is -- and the PSR recognizes this -- Mr. -- Bill

19   benefitted from APG from his, from his actions with APG

20   $5.7 million.  I understand what the tax liability is now,

21   but his benefit, as calculated, was $5.7 million.

22        The other part I think that's important is --

23   I know, Your Honor, at the end of the day, he should have

24   turned himself in.  There's no dispute there.  However, I

25   think something that's important to note to the Court is

1   Mr. Reed has been continually cooperating with the government.

2   He had been speaking to Special Agent Ricky in this time

3   period.  Mr. Reed had an attorney that he was speaking to

4   through this whole period that was there.  Unfortunately,

5   when he was advised that the Indictment had come down, he

6   was also advised that his attorney was now disbarred.  And

7   so Mr. Reed had full intentions of turning himself in;

8   however, Your Honor, an attorney, and was reaching out, and,

9   apparently, I believe, had reached out to Stan Hunterton,

10  his attorney before he got Mr. Hunterton, advised him you

11  can wait until Tuesday to turn yourself in.  And if you look

12  at the hotel bills that were confiscated, sure enough, he was

13  booked up until the Monday before, and that's when they came

14  and got him.

15          So I think the bigger picture is he's got $4 million

16  out there.  He's known that he's been the target of an

17  investigation for three years.  He had his passport.  If he

18  really was going to leave or really try to obstruct justice

19  and run from the government for this, why wouldn't he have

20  left in 2008 or 2009 or 2010?

21          I mean, that shows that this  is a man that knew he

22  was the target of an investigation.  He certainly had money

23  out there to abscond, if that's what he wanted to do.  And

24  he didn't do that.  So if you take all those factors into

25  consideration, the fact that his lawyer got disbarred -- and,

47

1  yes, at the end of the day, should he still have turned

2  himself in?  Yes.  But -- and not to justify it, but it

3  gives some sort of clarification, some reasoning as to why

4  he didn't turn himself in right when he was going to, and was

5  trying -- and that's fair because a lot of defendants don't

6  want to turn themselves in without their attorney present.

7  So I would ask you to take, the Court, that into

8  consideration.

9         Again, I don't want to harp on the testimony in

10  Colorado.  He was the target of the investigation in the

11  District of Nevada.  That subpoena was given to him by the

12  special agent in charge of the case in the District of Nevada.

13  That special agent sat in that meeting and they advised him

14  that anything he used against him would be used against him.

15  So I understand he wasn't yet indicted, but I think that's

16  taking a very black and white approach to it, to not give

17  him credit for something that anybody else would have gotten

18  credit for.

19         And, also, Your Honor, he's 63-years-old.  At

20  12 years, or whatever the recommendation sentence is, that's

21  equivalent to almost a life -- hopefully, not a life sentence

22  but, very potentially, could be a life sentence for him.  It's

23  a significant sentence.  And it's more of a, it's more of a

24  sentence than most violent offenders would get; a sentence of

25  12 years or the 132 months.

1          So, Your Honor, I would ask you to take all of this

2   into consideration and we believe again -- we would ask you to

3   sentence him to the 72 months.

4                THE COURT:  All right.  Thank you, Ms. Armeni.

5                MS. ARMENI:  Thank you.

6                THE COURT:  And Ms. Armeni, you mentioned the

7   defendants' sister.

8                MS. ARMENI:  Yes, Your Honor.

9                THE COURT:  There are many people here.  I don't

10  know who that is.

11          Ma'am, why don't you come on up and we just ask you

12  to come up to the microphone here and state your name, please,

13  for the record.  And then I'll be glad to hear anything you

14  wish to say on behalf of your brother.

15                MS. REED:  My name is Nancy Reed.

16                THE COURT:  Go ahead, Ms. Reed.

17                MS. REED:  Thank you, Your Honor, for the

18  opportunity for me to speak.  And there are just some things

19  I would like to say about my brother as a person.

20          He is the oldest son in our family.  He's always

21  been the closest to our mother.  Since our dad died four years

22  ago, he has been her rock, and he helped her to adjust to

23  living alone for the first time in her life when she was

24  84 years old.  And he's helped her navigate everything from

25  car maintenance, to repairing the air conditioning.  He's

1    really been there for her.  And it's our prayer that he's

2    released in time to spend time with her.  She's 88 and she

3    has terminal emphysema.

4            Your Honor, I want to say what a great dad Bill

5    has been to his sons.  And now that they're old enough, he's

6    counseled them about looking at his mistakes, and he wants

7    them to learn from his mistakes.  But, that's not the dad they

8    grew up with or they remember.  We know the dad that really

9    taught them a love of nature and to be sensitive to the

10   environment, and to leave no footprint behind when they were

11   entering the wilderness.

12           Probably their favorite vacation is the memory of

13   when Bill rented an RV in Utah, and we went on a big trip

14   across, all the way to Fargo, North Dakota, where we were born

15   and raised, Bill and I, and fishing in all the rivers in

16   Montana all the way across.

17           And he's always been there for them.  He loves to

18   be with them, and it's been really hard for him to be away

19   from them.  And they love to talk, everything from politics

20   to psychology and current events, and he's really taught

21   them to appreciate things.  And they're very thoughtful and

22   responsible young men, and no small part because of the time

23   he spent with them.

24           And I know Bill is sorry for the mistakes that he's

25   made, but he's really accepted what he's done.  And I think

1    in accepting it, that's really allowed him to focus all

2    his attention on spending every day as positively and as

3    productively as he can.  And he wants to redeem himself.

4            Every week he sends really uplifting letters to all

5    of us.  And for those of us -- his family and friends.  I

6    think there's 10 of us that get weekly letters from him.  And

7    for those of us that are lucky to receive them, we treasure

8    his words of encouragement and love, and he's really making a

9    difference.

10           And then on top of that, he's written two books.

11   This is his first book.  And this is his second book.  And

12   these -- the first one really reflects his daily practice of

13   mindfulness and simplicity that he uses himself.  And it's

14   called, Zen For Busy People.

15           And then his second book is called Simple Ways For a

16   Healthy Life.  And it's just a broad opinion, all kinds of

17   information on positive thinking and how to have healthy

18   relationships, and healthy eating and exercise to live a

19   healthier life.

20           And, you know, he's, I think he's thinking ahead or

21   he's moving forward.  He's not dwelling on where he's been,

22   even though he recognizes and acknowledges what he's done.

23           And as Ms. Armeni said, not only can these books

24   help people, he's planning on writing more.  He's got several

25   ideas.  He wants to actually do a series of books like this.

1    And not only can they help people as stand alone, but they are

2    great and valuable tools for him to get speaking engagements

3    when he gets out, and he's a very powerful speaker, public

4    speaker.  And that's what he's already doing, as you know, at

5    the detention center, helping youth.

6            And so I just -- I collaborated with him on these

7    books and I really see his drive to be a positive force for

8    change.  And he's transforming himself, but he's also hoping

9    he can help other people transform as well.  And, hopefully,

10   these will make money and he can, you know -- I know, of

11   course, I heard the figure today, which is, is a stunning

12   amount of money, but any bit that he can, to pay back his

13   debt to the IRS; but, also, a way for him to make a life for

14   himself when he's released.  And I think he really has a lot

15   to offer and he wants to be a productive citizen.

16           Thank you so much.

17               THE COURT:  Thank you, Ms. Reed.  Appreciate

18   it.

19           Ms. Armeni, why don't you and your client come

20   forward, if Mr. Reed wishes to say anything on his own

21   behalf.

22               DEFENDANT REED:  Thank you, Your Honor.  And

23   I'll be brief, Your Honor.

24           My name is Bill Reed.  And the first thing, Your

25   Honor, I want to acknowledge the attendance of my 88-year-old

1    mother and my two sons, Jack and Kirk, who I adore.

2            Mother, how are you?

3            And, of course, my sister Nancy.  And my best buddy,

4    Mark Bradley (phonetic), Your Honor.  We've all known each

5    other, Mark and I, for over 20 years.  They've been very

6    supportive, Your Honor, in these 27 months while I've been

7    incarcerated.  I love them all and I appreciate you all coming

8    and all that you've done.

9            With regard to my case, Your Honor, there isn't a

10   day that goes by that I don't ask myself what was I doing back

11   in 2000 to 2006.  I associated myself with a convicted felon

12   who was in jail at Nellis Air Force Base, Rick Neiswonger.  I

13   did that.

14           Then I associated myself with Wendell Waite, who

15   I thought was a tax expert.  Well, he led me and other

16   clients, apparently, astray with regard to taxes.  And I did

17   it voluntarily.  It wasn't conceived as a criminal enterprise.

18   It was like a perfect storm of bad choices and bad decisions

19   that created an entity where he was selling shell

20   corporations, Your Honor.  And people used these corporations

21   for illegal means -- primarily, with regard to Mr. Damm or

22   with the IRS -- they'd use these corporations to hide their

23   assets or their income.  We didn't teach them to promote that,

24   but that's what they did.

25           And all I can tell you, Your Honor, is looking back,

1   it's just absurd to me that I would go into business with a

2   convicted felon in jail.  I mean, if my son came to me and

3   said, dad, you know, I think I got a new partner.  He's a

4   convicted felon in fraud in St. Louis, and he's in jail and,

5   when he gets out, I'm going to go into business with him.

6           It's a mistake, Your Honor.  And I have no one

7   to blame.  I assure you.  I made those choices and I regret

8   them.

9           And as far as selling shell corporations, Your

10  Honor, you know, we have background checks right now for

11  selling guns.  There ought to be a background check,

12  especially post-9/11, before you sell a Nevada corporation.

13  Because I know who bought them, but I had no idea who

14  eventually used them.  And there was no legal requirement

15  but, in the end, I was charged with conspiracy.

16          And so there's -- the point here is, judge, I don't

17  say this to diminish anything I did.  I say this primarily

18  for the benefit of my boys.  I hope they never repeat the

19  mistakes that I made, Your Honor.  It's horrible.  So I share

20  this with you, and I share this with my sons.  But, there was

21  a punishment involved, judge; I mean, apart from jail.  It

22  is that I'm here, their father, in jail, a convicted felon.

23  And for that I will be eternally remorseful, Your Honor.  It's

24  disgusting.  It's humiliating.  It's embarrassing.

25          And I apologize to you guys.

1            I don't know what they tell their friends, Your

2    Honor.  What do they say?  Where's your dad?  Is he dead?  No,

3    he's in jail.

4            And I mean that, you guys.

5            As far as Mr. Damm's concerned, Your Honor, he

6    paints this, you know, horrible picture.  But I just want

7    you to know that, at every instance, I tried to cooperate.

8    Actually, Mr. Damn didn't deny that.  I really did try to

9    cooperate with Mr. Damn at every step of the way.  I don't

10   think there was an adversarial word ever said between me and

11   Mr. Damm.  I met him in 2008, and we met seven times after

12   that.  There was never any kind of a relationship where we

13   were stonewalling each other or denying anything.  I tried

14   to do the best I could.

15           And finally, Your Honor, I'll be brief.  It's the

16   last 27 months that I'd ask you to consider.  My goal for

17   the last 27 months, since I've been in jail, is redemption,

18   Your Honor -- not only for you, as a father, as a lawyer, as

19   an author, as a Zen follower, Your Honor.  I would like to

20   redeem myself; especially, in the eyes of those boys.  That's

21   what breaks my heart.  I hope to do that.

22           So from the day I was incarcerated, I've written a

23   two-page letter every day to the ten people that are close to

24   me, including them.  I've written over 750 letters.  Then, in

25   the afternoon, I wrote a couple of pages of manuscript for the

1    books that Nancy helped me with.

2              Thank you, Nancy.

3              She edited the books and helped get them published

4    on Amazon, Your Honor.

5              But, a day doesn't go by when I don't try to inspire

6    and encourage my boys and the people around me, either with

7    phone calls or with letters or with the books themselves.

8              It's a tragedy, Your Honor, and it's my fault.

9    If I could turn back the clock, I would.  All I can do is

10   press forward.  And that's what I tried to do.  And then

11   when I found the Life of Crime Program -- I've always been

12   good at public speaking.  But for the 12 consecutive months,

13   Your Honor, I've spoken to over 800 juveniles and their

14   parents.  It's a powerful presentation.  They're impacted

15   by it.  Parents bring their juveniles back to hear me again

16   because most of the inmates, frankly, they have tattoos and

17   they're on drug charges.  Those kids look at me and they see

18   they're bad and so they listen to me.

19             And I can assure you, judge, when I get out of

20   jail, I'll be on, on a path to the speaking circuit with law

21   enforcement agencies, Scared Straight Programs, or there's a

22   variety of programs Judge Hampton has pointed me to.

23             The books, there's no money in the books, Your

24   Honor.  But they provide me with credibility, and I'll write

25   more of them.

1          So my goal, judge, is, number one, to keep positive

2    and try to get out of jail as quickly as I can to help my boys

3    and the people around me.  I love them all dearly.  I miss

4    them terribly.  And, to be a caregiver to my mother.  I don't

5    know how much longer my mother has, Your Honor.  She's 88.

6    She has emphysema.

7          And once I get on the speaking circuit, Your Honor,

8    I could do some good.  I cannot only earn money, I'll have to.

9    And somehow Mr. Damm raised the idea that I have other monies.

10   I don't have any other money.  I surrendered every penny I

11   had.  It wasn't that complicated.

12         Then he said that I grossed 5.7 million during the

13   time that I was running APG.  That was gross income, not

14   taxable income.  The IRS was there.  They collected 2.9.  And

15   they told me -- and Tiffany was her name.  Ryan Ricky's IRS

16   agent -- she was very happy with the case.  They collected the

17   taxes that were due on 5.7, but the penalties and interest, as

18   we get these gigantic numbers, they weren't paid.  And I will

19   try to pay those back when I go on the speaking circuit -- and

20   I promise you that -- not just for me, I'm old.  But it's for

21   them, those boys back there.  It breaks my heart.  I don't

22   like to see them in this position and I'll do what I can to

23   rectify that.

24         And what I can tell you, judge, is I'm not the same

25   guy I was in 1998, that's when this started, when I went

1    into business with a convicted felon.  This is 15 years

2    later.  I'm older.  I'm different.  And I look forward to a

3    future with my family and friends as soon as I get out.  And

4    I can do something not only constructive, Your Honor, but

5    I can repay the IRS if I go on the speaking circuit.  It's

6    lucrative.  I can do something.

7            I'm sorry, you guys.

8            So, in this case, Your Honor, if you can see where

9    I'm headed and not where I've been, I will just tell you,

10   Your Honor, that any mercy you show me today, I promise you

11   it will not be squandered.  I'll make the best of it.  I'll

12   keep writing letters and books and I'll try to proceed.  And

13   as far as money -- that's what this case is about -- I'll

14   attempt to pay the IRS whatever I can based on how many years

15   I have left.

16           And I leave you with a final thought, Your Honor.

17   At 63, when you're in jail, and you can compute your own

18   mortality -- jail, by definition, is a dangerous place.  And

19   number two, when you're old, there's no medical attention,

20   so you get nervous.

21           So, if you give me a chance, Your Honor, I promise

22   you I'll make the best of it.

23           And I want to thank my attorney, Your Honor.

24   She did a great job.  She's a court appointed attorney and

25   she's terrific.

1          Again, thanks to all of you for coming.  I love you

2     all dearly.

3          Thank you, Your Honor.

4               THE COURT:  Thank you.

5          And you can remain here because this is the

6     opportunity to impose the sentence.  And something you just

7     said really rings true, Mr. Reed.  This is a tragedy.  And,

8     ultimately, it's your fault, as you said.  Nobody but you

9     bears responsibility for where you stand today.

10          You were once a lawyer and young.  You now stand

11     before me as a former member of an honored profession that,

12     by your conduct, you discredited.  And I don't know how it

13     came about, but 15 years ago or so, in 1998, after you had

14     lost your Bar license, had your Bar license suspended in

15     Colorado, you did make a fateful, and for you a tragic

16     decision.  There's no question about that.  And as you got

17     involved and formed with Mr. Neiswonger, and participated

18     with others in this Asset Protection Group, and other names

19     it was known by, became involved in a scheme to help others,

20     a scheme to defraud, and a scheme to help others defraud the

21     United States; made it easier for them to do so.

22          I found interesting the comparison to our ubiquitous

23     mortgage fraud cases.  And, God knows, we have a lot of those.

24     And those involve many, many, many people, each of whom plays

25     a little small part in the larger scheme.  And in fairness to

1   many of them, they probably have no big picture conception

2   of what is ultimately taking place.  And you may not have

3   understood fully what others that were using these shell

4   corporations could do.  But, yours was different than

5   those mortgage fraud situations.  You had a smaller entity

6   that promulgated some 2000 plus such corporations, shell

7   corporations, as I read in the papers that were filed.  And

8   while you might not have known the specifics, it had to be

9   clear the direction that they were going.

10          Your book, Bulletproof Asset Protection, while

11  it may have contained things that you agreed with, it,

12  nonetheless, advanced that scheme and gave, as you said

13  just now, the books you've been writing, a (inaudible) of

14  credibility to what you were doing.  And just as the books

15  you're writing now, for much different reasons, and more

16  thoughtful, would give credibility to the efforts at

17  redemption that you are making.  And they, they do that,

18  I'm sure.

19          You have fallen a long way.  You've spent now, by

20  my calculation, 27 months in custody and stand before the

21  Court, from all appearance, penniless.  I mean, you have

22  lost whatever hasn't been recovered -- and Mr. Damn says he

23  doesn't know what else could be out there.  I don't either,

24  if anything.  I don't know what might be available.  But

25  you're now in custody, penniless, convicted of three felonies,

1    three serious felonies.

2           And worse for you, I think, has to be the injury you

3    have caused to your family, to your mother, to your sons, to

4    your sister, your former wife, to friends that care about you,

5    people that love you, people that have written many letters

6    on your behalf.  And they're very interesting letters because

7    they reflect not only many good things about you, such as your

8    sister just presented, but they also, in many cases, candidly

9    address their impressions of your failures, of what caused you

10   to do what you have done.

11          They stand behind you.  They love you.  They care

12   about you.  They support you.  And you are making an effort to

13   support them, I recognize.  But, that's a tragedy that occurs

14   in every case that a judge has, in every sentence that I

15   impose.

16          Your letter, that's included, reflects a lot of

17   insight into what you've done and why you did it, and speaks

18   of your efforts at redemption, such as working in the programs

19   in the prison, in the jail, with the juveniles in particular,

20   trying to turn people around, writing about it, being prepared

21   to speak about it in the future, to do things to try and

22   correct some of your misdeeds.  And I hope you will continue

23   that.  But, you also note that there are consequences for your

24   conduct.  And, indeed, that's why you're here.  And the

25   consequences are here and now.

1          You're a gifted writer from all accounts.  You've

2   written about your case in your letter to me.  Ms. Armeni and

3   Mr. Damm have both articulately presented their positions, and

4   they are widely divergent on the degree of cooperation and

5   what consideration should be given to you in return for your

6   consideration or what might happen in the future.  And I can't

7   presage that.  I have no idea what may occur.  But, what's

8   happening now is not a story that's being written.  It's

9   something that you're living.  The now-ness of your story

10  is right now.  This is what's going to happen.  And you are

11  going to face the consequences, as you must and as you should,

12  in all fairness, for your conduct.

13          I've heard the arguments about did you try and sneak

14  away and secrete money?  And it appears to me that you did.

15  And maybe you were struggling internally about what, what you

16  should do.  I have no idea what was going on in the operations

17  of your mind at the time you were doing that.  You would

18  cooperate here and then do something, perhaps, inconsistent.

19  I don't purport to understand that and I don't need to

20  understand that to fashion a sentence in this case.  I've

21  got to focus on factors that relate to imposing a fair

22  sentence which recognizes and takes into account the United

23  States Sentencing Guidelines, and I do, but they're advisory,

24  and which then imposes a sentence which considers a variety of

25  factors that are setout in the Presentence Report under 18

1    U.S. Code 3553:

2              The seriousness of the crime.  Well, the crimes

3    were serious.  These are fraud, money crimes, but they are

4    serious.  There are victims in a very real sense, and society

5    in a larger sense;

6              Promote respect for the law.  How can we possibly

7    promote respect for the law if a serious consequence does not

8    flow from decisions made by a person who is gifted, who is

9    bright, who is a lawyer, a financial consultant planner,

10   someone who has the skills and the background that you have,

11   and does not suffer severe consequences for the misconduct

12   that you engaged in.  I think anything that minimizes that

13   would not promote respect for the law;

14             Providing just punishment is what the whole process

15   is about.  That's subjective.  What I think it just is not

16   what Ms. Armeni thinks is just.  It is not what Mr. Damn

17   thinks is just.  It's not what the people in this room

18   probably think is just.  I've got to fashion a sentence that

19   I think is a fair, a just sentence in this case;

20             To afford deterrence to criminal conduct.  I agree

21   with Ms. Armeni completely.  I don't view you as a recidivist

22   or a potential recidivist.  I mean if you don't get it by now,

23   there's no hope for you.  And I don't think, for a minute,

24   that when you finish your sentence that you will go out and

25   engage in further criminal conduct.  I accept that you will

1   earnestly, on supervision, and thereafter, try and redeem

2   yourself, not only in the eyes of your family, but to help

3   other people avoid the same kinds of mistakes that you have

4   made.  I hope I'm correct in that;

5           To avoid sentencing disparities.  Well, we don't

6   have much to go on in this case.  And that's where the

7   Sentencing Guidelines are seductively useful to us.  They

8   give some kind of benchmark that the Court can look at in

9   fashioning a sentence which, accounting for all these

10  circumstances, is probably not widely divergent from what

11  others would receive.  But they're not perfect, and I vary

12  from them all the time.  And I'm going to vary from them here

13  somewhat.

14          But considering all of those factors, it's my

15  judgment, while I appreciate fully and respect the able

16  advocacy of Ms. Armeni because she argues passionately and

17  well on your behalf.  And not just regarding Mr. Damm's

18  advocacy, because he also argues well and forcefully,

19  articulating the position on behalf of the United States.

20  It probably doesn't surprise you that I agree with neither

21  of them and will fall somewhere in between.

22          And what I'm going to do, having considered all

23  of those factors is, as to the charge in Count One, the

24  conspiracy count, impose a term of 60 months in custody.

25  That will be followed as to Count Thirty-one by the mandatory

64

1    two-year sentence consecutive to the charge in Count One.

2            So, thus far, a total of 84 months, Miss Clerk.

3            And then finally, on the charge in the Information,

4    the tax count, evasion of taxes, a 24-month sentence.  That's

5    a total of 100 -- consecutive, I'm sorry, to those other

6    two -- for a total sentence of 108 months.

7            Now, against that sentence you will receive credit

8    for the 27 or so months that you've already served in custody

9    awaiting today's sentencing.

10           Specifically, so to allay any confusion about where

11   you go from here, I'm going to order that the Bureau of

12   Prisons designate you promptly for a facility.

13           Ms. Armeni, I'll entertain a request for a specific

14   location.  The fact that your client may come back to testify

15   in other cases should not hinder his orderly movement to a

16   regular facility so that he can be in a better environment

17   than a pretrial detention center.

18           Do you have a request for a specific location?

19           MS. ARMENI:  Yes, Your Honor.  Our first request

20   would be Lompoc.  If Lompoc is not available, then Englewood,

21   Colorado.

22           THE COURT:  Okay.

23           MS. ARMENI:  And, Your Honor, along those

24   lines -- and I don't mean to jump ahead, but while I'm

25   thinking of it -- the RDAP Program.  I think there has

1   been a display in the PSR that he could benefit from the

2   RDAP Program.  So, I would ask that you make that

3   recommendation as well.

4           THE COURT:  Any position on the RDAP Program?

5           PROBATION OFFICER:  Your Honor, based on this

6   defendant's history, I think it would be an appropriate

7   recommendation.

8           THE COURT:  All right.  All right.  Thank you.

9       And Mr. Damm, I think that you don't have any

10  position or objection to RDAP.

11          MR. DAMM:  I have no objection, Your Honor.

12          THE COURT:  All right.  Thank you.

13      I will specifically recommend that Mr. Reed be

14  permitted, when eligible, and if eligible, to participate

15  in the RDAP Program.  I will specifically recommend that

16  he serve his sentence at either the facility in Lompoc,

17  California, or Englewood Colorado.

18      Now, the term of three years supervised release

19  will be imposed.  That will include the standard conditions of

20  supervision and the following special conditions:

21      First, that you pay restitution in the amount --

22  and, again, I'll need Probation to check me on this -- but in

23  the amount, total amount of $48,408,751.00.

24      As I read the recommendation, that is the correct

25  total amount?

1              PROBATION OFFICER:  No, Your Honor.  I'm sorry.

2              THE COURT:  Okay.  Give my the correct one.

3              PROBATION OFFICER:  I believe the correct

4     amount, and I'll have to add this, is the thirty-four

5     million --

6              THE COURT:  Four zero eight?

7              PROBATION OFFICER:  -- four zero eight; plus the

8     five million --

9              THE COURT:  Ah, plus the five.

10             PROBATION OFFICER:  -- seven hundred fifty-two

11    thousand ninety-three dollars and seventy-seven cents.

12             THE COURT:  I'm sorry.  I was looking at page 31

13    of the Presentence Report, so that needs to be corrected.

14             PROBATION OFFICER:  Yes, Your Honor.

15             THE COURT:  Give that to me again.

16    34,408,751.00 plus --

17             PROBATION OFFICER:  That's to the IRS.

18             THE COURT:  Right.

19             PROBATION OFFICER:  And then there is the

20    payment to the FTC --

21             THE COURT:  FTC.

22             PROBATION OFFICER:  -- in the amount of

23    $5,752,093.77.

24             THE COURT:  All right.  Those two figures -- and

25    Eileen, I'll let you total them because I will botch the

1    math -- but it's just a little over 40 million, forty million

2    and hundred thousand dollars.  Something like that.

3              And, the $300 mandatory penalty assessment will be

4    due forthwith.

5              Additionally, the following special conditions will

6    apply:

7              First, that you not possess any firearms, dangerous

8    weapons, or explosive devices;

9              Second, that you be subject to the warrantless

10   search of your residence, person, property and automobile

11   without a warrant, by the Department of Probation, at

12   reasonable times on reasonable suspicion;

13             Third, that you be subject to substance abuse

14   treatment programming.  That will include drug testing at a

15   maximum rate of 104 tests per year;

16             Next, that you receive mental health treatment

17   programming under the direction of the Department.

18             You wanted to argue that.

19             MS. ARMENI:  Yes.

20             THE COURT:  And I jumped right over that.

21             MS. ARMENI:  It's okay.

22             Your Honor, it's just there is no, there's no basis

23   for the condition.  It's just an added, another condition

24   added on top of other conditions that he has to comply with,

25   and there's really no basis, that I can see, that has been

1    delineated from in the PSR.  It would seem not necessary.

2                    THE COURT:  Let me, in fairness, ask the

3    Probation Department if they have a position on that.

4                    PROBATION OFFICER:  Your Honor, if the Court

5    notes the mental and emotional health section, the defendant

6    had admitted -- and some time has since passed, but when the

7    initial interview took place, the defendant had shared some

8    stories about the ways in which he was trying to positively

9    deal with stress and anxiety, most of which may have been

10   situational.

11                   Quite frankly, I don't know at this time that I

12   would feel strongly one way or the other to continue to

13   advocate for the condition.  At the time, it seemed like an

14   appropriate and prudent recommendation.

15                   THE COURT:  All right.  I think at this time I

16   will go ahead and dispense with that particular requirement.

17   That's subject to the Department of Probation, upon your

18   release, coming back.  And it's an easy modification to

19   request; in fact, it's generally consented to.  But we will

20   scratch that at this time.

21                   Next, that you be prohibited from incurring new

22   credit charges, opening additional lines of credit or

23   negotiating or consummating financial contracts without

24   approval of the Department of Probation;

25                   Next, that you provide the Department of Probation

1    with access to all financial information requested of you,

2    including your personal income tax returns and information;

3            Next, that you cooperate with the Internal Revenue

4    Service to pay all past and present taxes, interests, and

5    penalties; and

6            That you file accurate and lawful income tax returns

7    while under supervision;

8            Next, that you cooperate with the Federal Trade

9    Commission, again, for the same purpose, to satisfy all past

10   and present judgments;

11           Next, that you use your true name and other

12   biographical information at all times and for all purposes;

13           Next, that you perform 100 hours of community

14   service.  I think that's something where your speaker's acumen

15   will be useful, along the lines of what you've been doing

16   already in the detention center.  That could be broken up over

17   the life of your supervision; and

18           Finally, that you report to the Department of

19   Probation within 72 hours of your release from custody.

20           I think I've covered all of the factors, but let me

21   ask if the government has anything further; or, Ms. Armeni, if

22   you do; and also, Ms. Beckner, if Probation has anything that

23   I, perhaps, failed to touch upon that you feel is necessary

24   regarding sentence.

25           MS. ARMENI:  Not from the defense, Your Honor.

1           MR. DAMM:  Nothing on behalf of the government.

2           THE COURT:  Are there remaining Counts to be

3   dismissed?  I was --

4           MR. DAMM:  Yes, Your Honor.

5           THE COURT:  All right.  I think you would both

6   want that.

7           Any remaining Counts will be dismissed as part of

8   the Plea Agreement.

9           And Ms. Beckner, do you have the conditions of

10  supervision available to provide to the defendant?

11          PROBATION OFFICER:  I do, sir.  Thank you.

12          THE COURT:  And is there anything else with

13  regard to the Presentence Report that you felt we needed to

14  address, to make any changes?

15          PROBATION OFFICER:  None other than have already

16  been addressed, sir.

17          THE COURT:  Okay.  All right.

18          Good luck to you.

19          DEFENDANT REED:  Thank you, Your Honor.

20          THE COURT:  I know you feel strongly about your

21  family.  They stand behind you.  They continue to stand behind

22  you.  It's going to be a while before you're reunited with

23  them.  I understand that.  But, hopefully, by your conduct

24  in the future, you can make that up to them in some small

25  measure.

1          All right.  Good luck.

2               MS. ARMENI:  Thank you, Your Honor.

3               DEFENDANT REED:  Thank you, Your Honor.

4               THE COURT:  All right.  Thank you very much.

5

6          (Court Adjourned.)

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                                -o0o-

2

3        I certify that the foregoing is a correct
         transcript from the record of proceedings
4        in the above-entitled matter.

5        \s\ Kathryn M. French              November 26, 2013

6        _____        _____

         KATHRYN M. FRENCH, RPR, CCR                 DATE
7        Official Reporter

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25